This is People v. Shaquille Stitts, S-T-I-T-T-S 1-17-1723. First, I want to apologize for the delay. Being virtual, the demands on our court staff are great, and the person who takes care of all this is doing all the arguments today. So we had to wait until the arguments before us were completed, and that's why we were delayed. So I apologize. Let me begin by telling you how we're going to proceed. We discussed trying to proceed as much as we can normally, as we would if we were in the courtroom. I think that's better for the attorneys rather than speak. Some justices have had lawyers speak for several minutes and then have the judges ask questions here at random. But instead, what we would like to do is that you'll each reserve whatever time you wish. We'll be liberal on the time. But when we have a question, we'll raise our hand. And when you see one of the justices raise his hand, if you would then finish your thought, and then that justice will ask a question. And then if another justice wants to follow up, he will raise his hand and then ask a question. Do you have any questions on the procedure? No, Your Honor. Thank you. Thank you. Ms. Harrigan, how much time do you wish? Probably about maybe 10 minutes, maybe a few minutes for rebuttal, depending. Okay. We don't have a clock on the screen. But, again, we're going to be liberal in allowing you to take a little more time, if you wish. And Ms. Warren? Yes. Approximately 10 minutes, Your Honor. Again, if you need a little more, that's fine. Thank you. Any other questions? This is being recorded for audio only. Okay. Available on the Supreme Court website within 24 hours. All right. Ms. Harrigan? Good afternoon, Your Honors. As you know, I represent Mr. Shaquille Stitts in this case. I expect to focus my argument on the first issue raised in my brief concerning the Confrontation Clause, but I'm prepared to answer any questions on the other two issues as well. The state elicited testimony from Mary Wong, a gunshot residue forensic scientist, about the results of the tests performed on Mr. Stitts' hands after his arrest. Her testimony consisted of the observations, analysis, and conclusions of another scientist who was actually the person that performed the testing near the time of Mr. Stitts' arrest. She reviewed this two years later. This evidence, the admission of this evidence, violated Mr. Stitts' Sixth Amendment right to confront the witnesses against him because, Your Honor, Justice Walker? You're on mute. You're on mute. Thank you. The state argues that Ms. Wong was an integral part of the analysis, therefore there was no confrontation violation because she was a part of the team that did the analysis and that she had as much information as anyone else would have had. How do you respond to that? She is not the person that reviewed the evidence when the swab was taken. She did not write any of her own reports or conclusions. Her testimony, in her testimony several times, all she said was she agreed with Mr. Burke's conclusions and analysis. So she herself was not an integral part, unlike the case of People v. Nelson where the person who testified actually was part of gathering the DNA and doing some of the testing and analysis. Ms. Wong was not in this case. And then we also have the fact that this testimony was clearly introduced for the truth of the matter asserted, that Mr. Stitts had gunshot residue on his hands. His hands were swabbed after his arrest and it was also testimonial because his testimony was provided by a person who was not an integral part of the testing, introduced for the truth of the matter asserted, and clearly testimonial under Williams. In fact, this case is on point with People v. Lewis where there was a firearms,    and clearly testimonial under Williams. In fact, and the person who did the testing wasn't available, like here, to testify about the analysis of the specific firearm, trying to connect it to the defendant in that case. So somebody else testified to his report, his analysis, or I'm sorry, her report, her analysis. She was on medical leave like Mr. Burke in that case. The state made some of the same arguments there as they did here, that the testifying expert was not a surrogate witness, was involved in the process, that the report and lab notes were informal. So somehow that didn't implicate the confrontation clause. However, this court concluded, Your Honor, Justice Hyman? If People v. Thompson, I mean, there seems to be, I mean, the state agreed that there'd been a violation of People v. Thompson. So the question is, shouldn't there be a retrial based upon that, that violation? Why should we even get into this confrontational clause issue if we were going to reverse? Your Honor, talking about the, the issue of the, the lay opinion testimony from Officer Poole? Yes. Well, we, we request reversal on any of the three issues that I raised and we request a new trial on those in the next case. Did you want me to address the second issue? Well, I'm just saying, if either, I'm just, if that is, to me, really the issue comes down, is this a close case or not? Because if it's that close, then it won't matter. But if it's a close case, then why do we, the court has tried, should try to avoid constitutional questions. And as I understand it, the reason the individual was not available to testify was he was on medical leave at the time. And we don't know what the situation might be when there's a retrial. So it may not be an issue when, if there's a retrial. That's, that's correct, Your Honor. I mean, I will address issue two, but I just wanted to point out that in Lewis, there was also an expert on medical leave and there was no indication of when that expert would be available. Now, in that case, there was no retrial ordered because in that case, the evidence was overwhelming. That is not the case here. And I make that argument in all three of my issues, that this was a very closely balanced case. There was no eyewitness to the shooting. The victim himself testified that he could not identify the shooter. His description on the stand was somebody tall and slim. He did not give that description to the police. The other gentleman who saw some, saw a shooting from inside his window said he never saw the shooter's face. There was an indication that he was wearing a hoodie. Three of these men were wearing a hoodie. Three of these men were tall and slim. And that's again, a subjective description. There was no actual estimate of height and weight of any of them. So in this case, the evidence is extremely close. In fact, the state didn't, couldn't even charge, didn't even charge my client until they got this gunshot residue test for issue one back, which shows how close the evidence was, what they had at that point. And as far as issue two, that was a question for the jury, who was in that video. That was an issue for the jury. Those safeguards weren't accounted for. The jury had no limitation on how they could consider Officer Poole's testimony as to the fact that this was the defendant and he had a gun in his hand as opposed to something else. And those were all questions for the jury. And there was no discussion. There was no off the record questioning of the officer or cautioning him not to limit his testimony. So under both, under both these issues, all three of these issues, we believe the evidence was close. Justice Hyman? Would the, with regard to the Thompson issue, do you believe there are any exceptions to it? I mean, here, even the state says it wasn't given, right? It wasn't followed. And they, they make some other arguments, but as to their other argument, is this something that's discretionary with us or in any case where the judge doesn't give those precautions, there should be a reversal. Well, I think, not a close case in this case. I think the way Thompson reads it's unclear if it's mandated. I would say that because this is an, we would argue that because this is an issue, an ultimate issue for the jury, that these safeguards should be implemented in these situations when you're having a lay opinion of what's on a video. Again, this is also different than some of the cases cited where I believe in one case, the person who testified to what something was, was familiar with what the stacks of cash looked like that were taken. This is just an identification of a person on a stairway. So this is an ultimate issue for the jury. So in this case, I believe these safeguards should have been followed that were outlined by Thompson. It was also, they have, in any case, even if the safeguards are followed, you have to look to the prejudicial effect of the testimony. And again, in an extremely close case to have an officer with an air of authority sitting on, on the witness stand saying, yes, that is Mr. Stitz and there is a gun in his hand. So those are, those are issues for the jury. And it was extremely harmful here in this very close case. Are you saying that the, excuse me? I'm sorry. This is judge Pierce. Are you saying that the officer pool could not testify the way he did? Or are you saying that you could testify, but they had to admonish the jury. They had to have a in-camera cross-examination and questioning of them before he testified, et cetera. I believe I'm saying at least there had to be, we're arguing that there at least had to be the safeguards of Thompson had to be followed that were not followed here, which, you know, at the, at the minimum that should have happened. I also think his, this testimony was extremely prejudicial and invaded the province of the jury, but at minimum. Yeah. But Thompson said, that's okay. Thompson said, you can't have a police officer testify. You have to get these admonishments. Well, again, your honors, I do believe that the admonishments that the, that the, there should have been a sidebar. There should have been questioning of the officer. There should have been admonishments to the jury. All these things were not done here. And again, this was an extremely close case. So it was highly prejudicial. So it makes it even more important that the safeguards would have been followed, should have been followed. Well, I, my reading of Thompson, just as Burke went through each witness who did give the opinion testimony to police officers and commented that the admonishments or the three safeguards were not employed and therefore the testimony was improper. So it seems to me that it is imperative that the three admonishments or the three safeguards should have been followed. Yeah. In Thompson, you're correct, your honor. In Thompson, I believe it was because it wasn't not prejudicial that they found it was harmless error. And I don't think we have this issue, that problem here. Well, it was prejudicial. It was prejudicial testimony. It hurt. It hurt the defendant. Right. It was prejudicial testimony without it being inadmissible. Right. It was prejudicial, but it was, they found it not harmless, but the court did find it prejudicial. And we believe in this case, it was prejudicial, especially without, without having gone through the safeguards that were necessary. Thank you. And the difference really is that in Thompson, they found it to be harmless because of the defendant's confession. Therefore the jury had another basis upon which to find the defendant guilty, separate and apart from the testimony. And where it's a situation where the safeguards were not put in place. Correct. And, and just to sort of, that's where you need to distinguish this case though, because if that's your argument, that's the argument you need to present to us now. And I know you've done that somewhat in your brief, but if you're arguing, that's the argument that you want to make that you probably should make it now. Well, again, that comes down to the plain error argument, because the defense counsel didn't object to, on the right grounds for issue one at all for issue two. So it has to be looked at under plain error and under prong one plain error. This evidence is extreme, is very close. Again, no eyewitness testimony. Nobody saw this offense. Nobody could identify the shooter. So you have sort of a theme in all three of my issues that the state introduced the gunshot residue through testimony of someone who didn't do the test, didn't do the examination officer pool told the jury, this is the guy and he has a gun. And even in the third issue, irrelevant testimony from an officer that she was from the fugitive division of the police department. That wasn't, that was completely irrelevant and implied to the jury that this person was wanted. And he wasn't, they let him go because they did not have enough evidence when they arrested him original. It wasn't a fugitive. So all three of these issues I have basically have the same theme because the case, the, they, these were all instances of plain air. And therefore this case needs to go back for a new trial. Um, if your honors have no other, yes, justice Simon. Oh, if we were hypothetically to send it back for a new truck, is there any other issue you raised that you think we would need to resolve before doing so? Or couldn't we reserve on all the other issues because of the retrial? Well, I believe that there's all these issues are merit meritorious. So I do believe there needs, I do believe there has to be at least some kind of ruling on issue on issue one, because if it goes back on issue two, and then a trial happens after let's, let's say all the safeguards of Thompson are complied with on retrial, then who, then what do we do with the testimony about the gunshot rescue? So it would be helpful to have some, some advice, some advice from the court above to direct the trial court on how to conduct a new trial. So I believe that these issues, at least the first two issues should be addressed before a new trial is, is taken. It may be moot if the original officer who conducted the test is available and testifies. It may be, but we, yes, we have, we don't know what the medical leave. I don't know what the situation is with Mr. Burke. No. So we don't know that. That's true. All right. Thank you very much. Okay. Thank you. Assistant state's attorney, Phyllis Warren, on behalf of the people of the state of Illinois, your honors, I will address all issues, but I'd like to focus on issue two, since that does seem to be of concern to your honors regarding detective pool's identification testimony. First of all, his identification testimony of the defendant in the video was proper. And that's because under Thompson testimony, that's rationally based on the perception of detective pool. That's helpful to a clear understanding of pool's testimony or determination of a fact at issue is admissible. And here, detective pool had a greater familiarity with the defendant than the jurors. And it was clear from that because detective pool testified, I spoke with the defendant shortly after this video was recorded. Not only did I speak with the defendant, but I spoke with the three other males that were with him that were arrested inside that apartment. And based on those physical encounters, I could tell who was who in the video. So there's an indication. There's a basis, excuse me, to conclude that detective pool was more likely to correctly identify the jury. And that's what Thompson allows. Now, while it's true, the procedural safeguards and Thompson were not followed to the letter. They were followed in the direct examination of detective pool. The purpose of the procedural safeguards that the Supreme court enunciated was so his testimony, the court could judge the probative value versus the prejudicial value based on the level of familiar familiarity with the witness, as well as, how long, how long he knew the witness and how frequently he saw him and detective pool testified to that. And he was subject to cross-examination. I'm sorry to your honor Hyman. I couldn't tell if you raised your hand or not. I apologize. Thank you. I was looking down. No need to, uh, my understanding Thompson though, this is something that judge has to tell the jury. I mean, the state even says it didn't happen. Okay. So as I read the case, it appears to be without discretion. I mean, is, as justice Pierce was saying, it's not the question whether he can testify or not. That's not an issue. The question is did the jury get the proper instructions of caution with regard to this testimony? If that's done, there is no issue. And that wasn't done. And this is, if it's not, if it's a close case, then it's very important that those instructions be made. That's why to me it's very important whether it's a close case or not. The whole thing turns it to me on that issue, because if you read Thompson, there's no doubt in that, the way the court decided, I believe, you tell me if I'm wrong, that it's, these are required. Your honor is, uh, the SED or counsel for the SED indicated, um, that it's unclear as to whether or not these are mandated or whether or not, um, these are, uh, things that should be filed. Um, and it's the state's position that even though they weren't preferred to the letter, uh, they were satisfied on direct examination because the purpose about that is to ensure as your honor, uh, is excuse me, if I could just have a second to collect my thoughts, I apologize. Um, the purpose, uh, behind that is to ensure, uh, that the testimony involves only how long he knew the defendant and how frequently he saw him, which is what detective pool testified to. And your honor's point about, uh, well, the jury wasn't instructed because it's a law enforcement officer. There was an objection that was made when the detective pool originally stated, um, I learned on the video, you can see the defendant with a gun. There was an objection as to speculation. And the court overruled that objection and said, that's, that's what he's saying. He saw thus effectively telling the jury, look, if that's not what you see on the, on the video, then disregard it. And that's what the jury's ultimately instructed that anything that's not supported by the evidence disregard. This didn't invade the province of the jury because the jury could have looked at the video and said, and looked at the defendant and said, yep, not him. They had their own ability to make that determination. Your honor Pierce is that, uh, I'm sorry. Is that a handout? It is a handout. Thank you. But Thompson says that after the police officer testifies that the jury should be instructed essentially that they shouldn't give too much weight to the fact that he's testifying and he's a police officer, that it's their province. They have to weigh the evidence, et cetera. That wasn't done on direct examination or cross examination, or it wasn't done by the judge after he testified. Was it? That's correct. Your honor. It was not done. Um, however, that's why it would be the people's position that any error in failing to follow the safeguards, uh, the procedural safeguards and Thompson would have been harmless and respectfully. But it would be harmless. Excuse me. It would be harmless. Like in Thompson, if the case was not closely balanced, right? Correct. Your honor. And respectfully, it's the state's opinion that the evidence in this case was overwhelming here. You had the victim in this case testify that the shooter was tall and slim. You had the eyewitness testify. There's only two people out there Creed who had dreads my neighbor. I know him and the shooter. Both of those individuals ran inside of Creed's residence. The police go inside that residence and find Creed, the defendant and two other individuals. Those two other individuals were not tall and slim. That was clear from polls testimony. In addition to that, officer Vaselli, before the officers entered into that residence, officer Vaselli saw the defendant throw a gun that was connected. Excuse me. It wasn't just connected. It was determined to be the gun that was used in the shooting. He sees the defendant throw it outside the window. Not only do you have, I mean, that's circumstantial evidence of the defendant's guilt. He's trying to get rid of the evidence and he's the only individual inside the residence that's tall and slim and the eyewitness who saw the shooting while he couldn't see the face said, Hey, the shooter ran in that residence. Not only did you have that your honors, you also had the video and the video speaks for itself. And when you look at the video, you can clearly see, uh, the defendant along with Creed with his dreadlocks running back from the area where the shooting took place, running up those stairs with a gun. It's clearly visible in his hand. It's the shape, the size. Yes, your honor Walker. So you acknowledge that all the evidence here is circumstantial, but as we talk about some things, it seems like we're missing something here. We all recognize that the judge is to give the proper instruction to the jury on the weight of the testimony, but what's being ignored also is that this is that's not the only procedural safeguard. There are other procedural safeguards. One of those being that the defense attorney did not receive the opportunity to provide his testimony. And that hasn't been mentioned by anyone at this point, either side. Yes, your honor. And that is correct. That procedural safeguard that Thompson list was not followed. But again, that's why any error would have been harmless because the evidence in this case was overwhelming. I acknowledge that there weren't the procedural safeguards followed to the letter, but they were checked off on direct examination. And any error would have been harmless because there there's nothing else he would have gained during cross-examining, excuse me. To be more clear, there's nothing that defense counsel would have learned or the judge outside of the presence of the jury by cross-examining Poole. Poole's testimony was only that, Hey, I'm able to identify this individual more so than the jury, because I met with him shortly after the shooting in the hours after it, not only did I meet with him, but I met with all the other people, not all, excuse me, the three other people that were arrested with him. And based on the physical encounters, I can identify that guy there. That was Jones. This guy here was Creed. That was Wheeler. That was the defendant. There would have been nothing gained by cross-examining this detective outside the presence of the jury. And this information was tendered to counsel in discovery council knew what Poole's familiarity was with the defendant, because it was, I mean, it's a reasonable inference that it was tendered in the reports. There was no, there was nothing that was cross-examined that, Hey, you left that out, that you were familiar with this defendant prior to, or that you interviewed the defendant prior to there'd be nothing gained by interviewing him outside the presence of the jury by defense counsel. And again, it's a state's position that the evidence here, any error would have been harmless given the overwhelming evidence of the defendant's guilt. Additionally, I'm sorry, your honors. I just lost the train of thought that it's from home. I've got my two children and there's a yelling outside the door. Okay. You're doing fine. You're doing fine. You're doing great. I apologize. It just threw me off track. Don't worry about it. I mean, big distinction, excuse me. On your kids. I mean, really don't. No, no, no. That's my husband's with them, but they're, they want mommy. So, especially when mommy's working. Thank you for your understanding. Distinction here is that in that confession in Thompson, and we don't have that here. So we say the evidence is closely balanced. I'm not sure. And I don't, I don't think any of us is sure at this point, we still probably need to come through the record and figure that out. But I think that's the elephant in the room is whether or not the evidence was closely balanced. So if you want to argue that, that may be where you want to focus your argument right now, because I think that's the elephant in the room. And we haven't made a decision on that. Thank you, your honors. As I said, as I was saying, I apologize. It's the state's position that the evidence in this case was not closely balanced. As I indicated before the victim in this case, identified the shooter as tall and slip. The eyewitness said, there's only two people out there, Creed, my neighbor, who I know, as well as the shooter. Both of those individuals ran inside Creed's residence. But no eyewitness to the shooting, correct? No eyewitness who can facially identify the shooter by face. Correct. But, but there was an eyewitness to the shooting itself. And that's tour the accountant who lives across the street from Creed. And he says, I see Creed, my neighbor across the street and I see the shooter and the shooter is still shooting at the car. Long's car as, as long dries off. And then I see according to the eyewitness tour, I see both the shooter and Creed, excuse me. First, he says I see the shooter go up to Creed and together Creed and the shooter go inside of Creed's residence. And then the police shortly thereafter, go inside of Creed's residence. And inside Creed's residence is Creed, the defendant, Wheeler and Jones. Neither Wheeler or Jones fit the description of a tall or slender individual. Creed is tall and slender, but he's the eyewitness to the actual shooting said it was not Creed. He has dreads. And I know Creed and Creed was standing on the sidewalk. I could see Creed. Additionally, the defendant is the one that is seen by the officer shortly before they enter the residence, throwing the gun out the window. And that gun was determined to be the gun that was used in the shooting. And in addition, if your honors look at that videotape from the porch of Creed's residence, you will see based on the physical encounters that the detective had, excuse me, detective pool had with those individuals. You can tell who is who you can see Creed with his dreadlocks. You can see Jones with the white stripe on his jacket. You can also see Wheeler who he pull, I believe identified as being the shorter, more Husky individual. And then you see the defendant clearly tall and slender by far. You can see that and you can see the defendant run out of the yard and you can see the defendant run back inside with Creed following behind him. They're the only two that left the yard and in his hand is a gun. When you take that evidence together, yes, it's circumstantial, but there's direct evidence as well, because he's the one who throws the gun out the window. All that evidence together overwhelmingly establishes the defendant's guilt. And the jury thought so too. The jury found the defendant guilty. And it's a safe position. The evidence was overwhelming. And I understand your honor said, well, that, that turns, you know, the out that turns the other issues that is correct. And I would like it to, to some extent, let me rephrase that. Regarding the first issue, it's the state's position that no error occurred because the confrontation clause was not violated. Wong was qualified to testify as an expert without an objection based and based her opinion about defendant's gunshot residue results on her own independent review and analysis of the data and images produced from the machine, the scanning electron microscope. And she explained how that worked. The machine identifies particles. It then takes images and photos of the particles. It then determines its composition, the machine, the instrument then prints out a automated analysis of the data. And while she was not the individual that actually operated the SEM during the time of a defect, one defendant's GSR kit was analyzed. She did independently review that data and images. And she did independently form her own analysis and form her own opinions. And based on the data and images from the instrument, she was able to give her opinion to a reasonable degree of scientific certainty. She also testified she was the one responsible for the maintenance of the machine and based on the data from the three controls, she could tell the machine was working properly and properly functioning. She was thoroughly cross-examined about her opinion, the basis and the function of the SEM, the scanning electron microscope. And importantly, the defendant doesn't suggest a single question that he could not have asked Wong that he would have asked the testifying or the non-testifying witness. And the defendant at the trial level, not once ever contested the accuracy of the data or images from the scanning electron microscope, which did the bulk of the GSR analysis. In fact, during a pretrial conference, trial counsel said, Hey, look, I reviewed the data and I reviewed the results from Creed's GSR kit, the defendants and wheelers, and I even had others do so. And she never once suggested that the data was anything but accurate. Given that Wong had an independent opinion and analysis, and it was subject to cross-examination, there was no violation of the confrontation clause. And this is exactly similar to what happened in Nelson. In Nelson, this court rejected the very same argument that counsel or excuse me, that defendant makes here today. In Nelson, the trial court admitted a technician's trial testimony regarding a DNA analysis in which that technician was not the one who actually performed the extraction and the purification of the DNA, nor was he the one who operated the robotic instrument that was used for the bulk of the DNA work. And this court found, it's not a violation of the confrontation clause because he independently reviewed the data and documentation. He performed his own analysis and he established the proper controls were used. I apologize. Yes, your honor, your honor. Hyman. Yes. My understanding is that she qualified her testimony and she said that Stitz either discharged a firearm, was in the vicinity of a discharge firearm or came into contact with a gunshot residue item. That's again, not very clear that he necessarily is a shooter. So I mean that qualification is, you know, it's all circumstantial. Your honor, regarding a gunshot residue kit, the results are either positive or negative. When it's positive, the best an analyst can say is that they can never say this person was a shooter. And I think that's what your honor just indicated that it's possible. He was in the range. He handled an item that was gunshot related or that, that he fired a firearm. They can never say definitively that he in fact was, was a shooter. Exactly. Goes to the question of whether this is a close case or not, particularly when we appears the testimony that he was a person who threw the gun out the window. So. Your honor, I believe that the GSR was one piece of the circumstantial evidence in the totality of the overwhelming circumstantial evidence. Well, there is not a single eyewitness about the facial identification of the person. There wasn't eyewitness to the actual shooting. And when you put all the evidence together, it overwhelmingly establishes the defendant, the defendant's guilt. You have a video of the defendant running from the scene of the shooting with the gun in his hand. You have the defendant leaving the yard first before, and he, only he and Creed are the two individuals who leave the fenced in yard in front of. Creed's residence. And then they both come running back. That corroborates the eyewitnesses testimony that, Hey, there's two people out there. And this was an accountant. This was an individual who had a member of the neighborhood. This was a person who had no, no horse in the game whatsoever, who says, look, I'm just locking up my house for the night. I see my neighbor who I know standing outside. And I look, cause I hear gunshots and I see this other individual with. Walk the other individual shooting. And, and that individual, the shooter walks up to create and together they go inside Creed's house. And then the defendant just so happens to throw the gun that's used in the shooting out the window. And he's the only one in that apartment that fits it. I believe it's the evidence is overwhelming. Okay. I think you're repeating. I apologize. Is there anything else? I have another question. Can you get to the third issue though? Regarding Vasili's testimony and officer Sherry college testimony. About the prior arrest and all this came in about the fugitive apprehension division of the Chicago police department. Absolutely. Your honor. All the issues are important. I realized you started off by saying you thought just one issue was, was overwhelming. And I think they're all important. I apologize if I said all that one issue was overwhelming. I believe the evidence of defendant's guilt was overwhelming in this case and all these issues deserve to be heard. Your honor. Absolutely. Correct. Regarding the first issue, the defendant's right to a fair trial was not violated here. The trial court did not abuse it. No, I asked you to get to the third issue. The third issue is regarding Vasili's testimony. Yes. From the fugitive apprehension division of the Chicago police department. There's different officers. I apologize, your honor. I didn't mean to overtalk you. I apologize. Well, that's fine. It's just that it's the third issue that I want you to get to the third issue race on appeal. Yes. And the third issue, the defendant submitted his right to a fair trial was violated because of a motion in limine in which defense counsel said, we want to bar Vasili from saying that he knew that he was familiar with the defendant. Remember that Vasili was the one who saw the defendant at night from a second floor window, throw the weapon outside. And the court said the court. Denied the motion in limine. And if the court's ruling was not an abuse of discretion, the court said, look, he can testify. That he recognized the defendant because it goes to the circumstances or the basis of his identification of the defendant at night at that time from the apartment. And the court put a limit on it to the prosecutor and said, you can't go into how you know, the defendant, you can only go into that you've seen the defendant before. And, and such testimony, the court said would not imply anything about prior arrests or criminal history. And the prosecutor fully complied with the court's directive during direct examination. The only thing that the prosecutor listed elicited from Vasili was that he recognized the defendant because he had seen him before. That was it. That was all he brought out and his testimony about recognizing the defendant was proper because it went to the basis for his identification of defendant. Under the circumstances under which he first viewed him at night from a second floor window from the alley where the defendant was throwing out the trash. He said, well, yeah, I recognized who it was. And then later on, he went inside the residence. And there was further evidence to show that the, his identification of the defendant was correct because he was the only one, excuse me, the defendant was the only one coming from the back of the back of the apartment. Defendants concerned that this was an implication of a criminal history. That's what it comes down to is. Officer Vasili shouldn't have testified that he knew the defendant because he had, that implies the defendant had a criminal history. That kind of ignores the fact that defendant was charged with UW felon and under, I'm sorry, unlawful use of a weapon of a felon. And so the party stipulated he had a prior felony conviction. So the implication that, Hey, he had a, he had a criminal history. That's really not a concern when the jury was made aware of that. And the comments made an opening and closing argument about knowing the defendant, I don't think he was publicly or openly admitted evidence that followed that evidence filed the court's directive in the motion, eliminating further. Officer Colas, our testimony, there was no objection to it whatsoever at all. And officer Cosa testimony was brief. She said, Hey, I'm, I, they asked her what her agency was or what. What unit she was assigned to. And she said she was assigned to the fugitive apprehension unit, which was responsible for bringing in individuals who were wanted for questioning or for other reasons. And detective pool had testified after we were, there was, I'm sorry, I'm talking too fast. So let me take a step back. Detective pool testified that everyone was arrested in the residence. Creed Wheeler Jones, the defendant, and that they were, they wanted to obtain that videotape and they had verbal results from the gunshot residue and they were all released two days later. So may 20th or may 30th, they would have been released a week after that pool gets the video. And then once pool gets that videotape, he then issues an investigative alert for creative, the defendant, understandably so because defendant can be seen on the videotape running with the gun and creeds run in, had run after him and runs back in. It wasn't until July 3rd that officer Coles are, who works for the apprehension unit test or was assigned to, to, to was assigned the investigative alert. And on July 3rd, she went out and arrested the defendant. That's all the testimony was. Look, pool has issued this investigative alert, July 3rd, I went out and I arrested the defendant. There wasn't anything to imply that the defendant had a prior criminal history that he was running from the law. Her testimony was relevant to explain the circumstances of his arrest. Both officers testimonies were proper because they were tied directly to this case and not any other crimes. Defendants reading it to you. I'm sorry. I appreciate it because we hit, we're running out of time. We have another argument. I apologize. I just want to point out one more, one more thing you're at or regarding the third issue. The defendant is reading into the record implications that didn't exist. And if you read the language that they use in their brief, it all talks about implies, implies, implies. There was no implication about it whatsoever. It went to the circumstances of how officer Vaselli could identify. And it went to the circumstances of how officer Coles are came to arrest him. It's for these reasons, your honors. And the reason stated in this brief that the people would ask your honor to affirm the defendant's conviction and sentence. Thank you. Thank you. Ms. Harrigan. Yes. Your honor, just briefly, a couple of points. I'm just addressing again, the close closeness of the evidence. There still was no eyewitness identification of the shooter. There was vague, there was vague descriptions of the shooter. And in this case, so there, this isn't a case of overwhelming evidence. There was no confession. The only thing that tied my client to the gun was the GSR test, which we maintain the testimony was error. And it was plain error because of the closely balanced evidence. And the fact that Vaselli saw him throw gun out the back, that does not implicate him in the murder. It implicate him as the shooter. I mean, it, it just indicates in conjunction with GSR test that he touched the gun. Vaselli never described him in his report. Never said he had an orange shirt. Then all of a sudden he's wearing an orange shirt inside. So then he was the guy off the window was wearing the orange shirt. This is a very close case. In addition is to issue three. There are numerous cases where the state does not present any evidence about defendants arrest. There was no relevance to the unit. This particular officer worked for the word fugitive is loaded. This is a jury trial. The state had a closely balanced case and they bolstered it with testimony in addition to the confrontation clause, the officer's narration and identification of my client as a shooter in a video. And if the gun was so apparent, why did he have to testify to it then if the, if the jury could have, could have discovered that on their own and by making inappropriate comments about the officer, knowing my client and the fact that he was a fugitive. So for these reasons, we ask that you reverse Mr. Stitz's conviction and remand this cause for a new trial. Thank you. I want to thank both of you for your arguments, excellent presentations under difficult situations and briefs were very good as well. We will take this under advisement and this particular session that we're going to take a recess. So thank you very much. Thank you. Thank you.